# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**500 WISCONSIN, LLC, and**
**SENECA INSURANCE COMPANY, INC.,**

**Plaintiffs,**

          **v.**                             **Case No. 18-CV-1845**

**JPMORGAN CHASE BANK, NA,**

**Defendant.**

---

# DECISION AND ORDER

---

### 1. Facts and Procedural History

Defendant JPMorgan Chase Bank, NA ("Chase") owned a multi-tenant office building located at 500 Wisconsin Avenue in Racine, Wisconsin, in which it operated a bank branch. (ECF No. 46, ¶¶ 1-2.) It sold the building in 2007 to BREOF Investors, LLC (ECF No. 46, ¶ 13) but continued to lease a portion of the building for its bank branch. (ECF No. 46, ¶ 2.) Another entity purchased the building in 2009 (ECF No. 46, ¶ 3), and on October 3, 2012, plaintiff 500 Wisconsin, LLC purchased the property (ECF No. 46, ¶ 4). Chase continued to rent a portion of the building. (ECF No. 46, ¶ 6.) In the

basement, which Chase rented, were safes, vaults, lockers, and safe deposit boxes that Chase used for its banking operations. (ECF No. 46, ¶¶ 7-8.)

Chase's tenancy ended on August 31, 2017. (ECF No. 46, ¶ 10.) As part of its cessation of operations in the building it had to ensure that all bank and customer property was removed from secure locations at the property, including property in the 6,824 safe deposit boxes (ECF No. 46, ¶ 80), 35 individual bulk cash coin lockers (ECF No. 46, ¶ 72), four small cash lockers (ECF No. 46, ¶ 73), four large bulk cash lockers (ECF No. 46, ¶ 74), six bulk cash/coin negotiable lockers (ECF No. 46, ¶ 75), two bulk lockers (ECF No. 46, ¶ 76), a vault (ECF No. 46, ¶ 77), a file safe (ECF No. 46, ¶ 78), and a four-door cash/storage locker (ECF No. 46, ¶ 79) (collectively referred to herein as the "subject property"). To open and inspect the secure locations, it was necessary for Chase to drill open 631 of the 6,824 safe deposit boxes (ECF No. 46, ¶ 85), 21 of the 35 individual bulk cash coin lockers (ECF No. 46, ¶ 72), two of the four small cash lockers (ECF No. 46, ¶ 73), one of the four large bulk cash lockers (ECF No. 46, ¶ 74), three of the six bulk cash/coin negotiable lockers (ECF No. 46, ¶ 75), and one of the four doors of the cash/storage locker (ECF No. 46, ¶ 79). Drilling left those safe deposit boxes and lockers unusable in their current state.

At the time Chase vacated the building, the vault door was not operational, but it is unclear if that was due to anything Chase did when it was closing the branch. (ECF No. 46, ¶ 77.) It is also unclear whether Chase drilled any of the two bulk lockers (ECF

No. 46, ¶ 76) or the file safe (ECF No. 46, ¶ 78). The subject property remained in the building after Chase vacated it.

Finding the subject property unusable, 500 Wisconsin submitted a claim to its insurer, plaintiff Seneca Insurance Company. (ECF No. 46, ¶ 112.) Although Seneca offered to repair the subject property, Seneca and 500 Wisconsin eventually settled the claim for $450,000. (ECF No. 46, ¶ 114.) Despite receiving that payment, 500 Wisconsin has not yet repaired or replaced the subject property. (ECF No. 46, ¶¶ 115-17.)

500 Wisconsin and Seneca filed the present action in Racine County Circuit Court. (ECF No. 1-1.) The complaint contains five claims, the first four of which are asserted on behalf of 500 Wisconsin: (1) breach of contract for Chase allegedly violating the lease by modifying the building without 500 Wisconsin's consent; (2) damage to property in violation of Wis. Stat. §§ 895.446 and 943.01; (3) conversion, relating to Chase's alleged destruction of property belonging to 500 Wisconsin; (4) negligence, as an alternative to 500 Wisconsin's conversion claim; and (5) a subrogation claim by Seneca for its payment to 500 Wisconsin on its insurance claim.

Chase removed the action to this court (ECF No. 1), and all parties consented to the full jurisdiction of a magistrate judge (ECF Nos. 5-6). On February 7, 2020, Chase moved for summary judgment. (ECF No. 35.) Chase also filed motions to exclude Donald Coker (ECF No. 29), Bryan Henne, Marc McGranahan, and Peter Moegenburg

(ECF No. 32) from testifying as experts for the plaintiffs. The briefing on these motions is closed, and each is ready for resolution.

In connection with its summary judgment motion Chase argues that 500 Wisconsin often improperly introduced new facts when responding to Chase's proposed findings of fact. (ECF No. 55 at 1.) While a non-moving party may appropriately offer "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon" to show a proposed fact is disputed, Civ. L.R. 56(b)(2)(B)(i), it is inappropriate to introduce new facts in a response, *Lanning v. Gateway Tech. Coll.*, No. 19-CV-890, 2020 U.S. Dist. LEXIS 121446, at *1 n.1 (E.D. Wis. July 10, 2020) (citing *Pollock v. ManpowerGroup US, Inc.*, No. 18-CV-107, 2019 U.S. Dist. LEXIS 199665, at *7 (E.D. Wis. Nov. 18, 2019)). Any additional proposed finding of fact instead is to be set out in separate "short numbered paragraphs." Civ. L.R. 56(b)(2)(B)(ii).

At times 500 Wisconsin's responses drift into improper attempts to introduce new facts. For example, in response to a seemingly simple proposed finding of fact— "Banking equipment, including safes, vaults, lockers, and safe deposit boxes … is located in the basement of the Building"—500 Wisconsin's response broadly states that the subject property are fixtures. (ECF No. 46, ¶ 7.) To the extent that 500 Wisconsin's response includes new facts rather than simply showing that a proposed fact is disputed, the new facts are disregarded. *See Lanning*, 2020 U.S. Dist. LEXIS 121446, at *1

n.1. The court considers 500 Wisconsin's responses only to the extent they may show that Chase's proposed findings of fact are genuinely disputed. *See* Civ. L.R. 56(b)(2)(B)(i).

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

## 3. Analysis

Chase's primary defense to the plaintiffs' claims is simple—Chase owned the subject property. According to Chase, because 500 Wisconsin cannot assert a claim for

damage to property it did not own, Chase is entitled to summary judgment on all counts in the complaint.

When Chase sold the building to BREOF Investors, LLC, the sale agreement excluded

> any property owned or leased by Seller or any Affiliate of Seller located in (i) any premises within a Property which is to be demised pursuant to a Seller Lease Agreement or (ii) any premises within a Property where Seller or any Affiliate of Seller is conducting its or an Affiliate's business (other than the business of owning the Properties) on the Effective Date … (e) artwork, computer and other equipment, computer software (except as set forth above), appliances, machinery, furniture, furnishings, indoor and outdoor automatic teller machines, moveable partitions, roof antennae, communication and interior and exterior security equipment, HVAC systems, data centers and data center components, generators, fuel tanks, communication lines, conduits, duct banks, wiring and runners relating thereto, and any and all other personal property, business equipment and trade fixtures of Seller or an Affiliate of Seller, whether owned or leased by Seller or an Affiliate of Seller, wherever located in a Property, if used exclusively in the conduct of Seller's business or the business of an Affiliate of Seller at a Property (other than the business of owning the Properties) ….

(ECF No. 46, ¶ 15.) Chase contends that the subject property fit within a number of these exclusions, including "interior … security equipment" and "business equipment and trade fixtures of Seller." Because Chase never sold the safes to BREOF, 500 Wisconsin did not purchase them when it subsequently purchased the building. 500 Wisconsin argues that the subject property were fixtures and thus were included in the initial and subsequent sales.

### 3.1. Chase's Challenges to the Complaint as a Whole

In its opening brief in support of its motion for summary judgment Chase contends that "[p]laintiffs' entire case is based on its assertion that 500 Wisconsin LLC owned the Banking Equipment drilled during decommissioning." (ECF No. 36 at 17 (all citations reflect the ECF pagination).) It says plaintiffs are wrong for five reasons:

> First, the Chase-BREOF sale agreement explicitly excluded the Banking Equipment from the sale. As a result, neither BREOF nor the subsequent purchaser RCS could have conveyed that Banking Equipment to 500 Wisconsin LLC. Second, Plaintiffs have adduced *no* evidence that the Banking Equipment should be deemed fixtures. Third, the undisputed facts establish that 500 Wisconsin LLC was on notice that it never acquired the Banking Equipment. Fourth, the parties' conduct at all times was consistent with Chase's, not 500 Wisconsin LLC's, ownership of Banking Equipment. Fifth, given 500 Wisconsin LLC's knowledge of the drilling and its ability to speak up earlier, Plaintiffs should be equitably estopped in this lawsuit from belatedly claiming ownership of the Banking Equipment.

(ECF No. 36 at 17-18 (emphasis in original).)

### 3.1.1. Exclusions in the Sale Agreement

As stated above, the Chase-BREOF sale agreement excluded from the sale any property owned or leased by Chase located in premises in which Chase is conducting its business, as well as "appliances, machinery, furniture…communication and interior and exterior security equipment…and any and all other personal property, business equipment and trade fixtures of [Chase]…whether owned or leased by [Chase]…if used exclusively in the conduct of [Chase]'s business." Chase argues that

> [a]ll the Banking Equipment—safe deposit boxes, cash lockers, vault, and safes—was excluded from the sale to BREOF under both categories of exclusion. First, the Banking Equipment is all located within premises in which Chase was conducting its business, specifically, in the basement which Chase secured and which housed the safe deposit box vault and others safes and vaults. Second, the Banking Equipment is clearly either "business equipment" or "interior security equipment" used exclusively in Chase's (banking) business.

(ECF No. 36 at 18.) In response, the plaintiffs contend that the subject property are neither business equipment nor interior security equipment but are fixtures, which were not excluded from the sale from Chase to BREOF. (ECF No. 44 at 6-8.)

The vague blanket exclusion whereby "any property owned or leased by Seller or any Affiliate of Seller located in … any premises within a Property which is to be demised pursuant to a Seller Lease Agreement" was purportedly excluded from the sale could not apply to fixtures. Thus, before determining whether this exclusion would apply to the subject property it is necessary to first determine whether the subject property were fixtures. The exclusion of "any property" must be read as applying only to personal property and not real property like fixtures. Otherwise, Chase's reading of the exclusion would introduce hopeless ambiguity into the sale agreement. Would obvious fixtures such as doors, ceiling tiles, lighting fixtures, carpeting, and floor tiles, be excluded because they were owned by Chase and located in the portion of the building where Chase conducted its business?

A fixture can be excluded from a sale of real estate only if the exclusion is specifically noted in conjunction with the sale. *See Premonstratensian Fathers v. Badger*

*Mut. Ins. Co.*, 46 Wis. 2d 362, 366 n.1, 175 N.W.2d 237, 239 (1970). And the sale agreement did exclude certain property, even if that property was otherwise a fixture. But Chase does not develop its argument that, rather than fixtures, the subject property was "business equipment" or "interior security equipment." It simply states that it "clearly" was one or the other. (ECF No. 36 at 18.) Perfunctory and undeveloped arguments are forfeited. *See, e.g., Basir v. Med. Coll. of Wis.*, No. 18-CV-1136, 2020 U.S. Dist. LEXIS 13641, at *27 (E.D. Wis. Jan. 28, 2020). Although Chase develops the argument regarding "business equipment" a bit more in reply (ECF No. 54 at 9)—too late to raise a new argument, *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012),—its argument remains superficial and insufficient to merit summary judgment.

### 3.1.2. Trade Fixtures

For the first time in reply Chase argued that the subject property was a "trade fixture" and excluded in the sale agreement as property Chase sold to BREOF. (ECF No. 54 at 13.) Again, "arguments raised for the first time in a reply brief are deemed waived." *Griffin*, 694 F.3d at 822. But the argument would also fail on its merits.

Trade fixtures are distinguished from fixtures. As discussed below, fixtures are part of the physical property, and "[t]hey pass by transfer of title to the land unless specifically reserved in the writing…." *Premonstratensian Fathers*, 46 Wis. 2d at 366 n.1, 175 N.W.2d at 239. "Trade fixtures are ordinarily installed or attached to the freehold by the tenant for his own use and for the purpose of promoting his business, and with no

intention on his part or on the part of anyone that such trade fixtures shall become, as a result of mere annexation, a part of the freehold." *Standard Oil Co. v. La Crosse Super Auto Serv., Inc.*, 217 Wis. 237, 243, 258 N.W. 791, 794 (1935). Because a trade fixture remains personal rather than real property, it is not properly a "fixture" at all. Trade fixture, Black's Law Dictionary (11th ed. 2019).

For personal property to constitute a trade fixture it must have been installed by a tenant during the tenancy. Trade Fixture, Black's Law Dictionary (11th ed. 2019); *cf. Renak v. Feest*, 2005 WI App 193, ¶ 8, 287 Wis. 2d 134, 703 N.W.2d 384, 2005 Wisc. App. LEXIS 608 (unpublished) (noting the circuit court's imprecise usage of the term "trade fixture" and finding the use of property in the life-tenant's business relevant to the intent element of the fixture analysis). It is the status of the owner of the property, and not simply the nature of the property, that separates a fixture from a trade fixture. For example, when a lessee installs walk-in coolers in a grocery store, the cooler is a trade fixture. *Lancaster's Inc. v. Webster's United Food Servs.*, 195 Wis. 2d 84, 537 N.W.2d 148, 1995 Wisc. App. LEXIS 671 (Ct. App. 1995) (unpublished). But when installed by the building owner a cooler in a grocery store is a fixture. *Premonstratensian Fathers*, 46 Wis. 2d at 373, 175 N.W.2d at 243.

The trade fixture doctrine encourages a lessee to invest in its businesses without fear that, at the end of the lease term, it will lose that investment (and provide a windfall to the landlord). No such concern exists with improvements made by the

owner of property, who may recoup its investment in improvements when it sells the property. Thus, limiting the "trade fixtures" doctrine to the lessor-lessee relationship is consistent with the policy underlying the doctrine. C*f. Standard Oil*, 217 Wis. at 244-45, 258 N.W. at 794 (noting that the "liberal rule with respect to trade fixtures" "is promotive of business, fosters the leasing of premises," and avoids injury to third-parties).

Moreover, the trade fixture doctrine allows for a return to the status quo—the condition of the property prior to the parties' relationship—without windfall or injury to any party. In a lessor-lessee relationship, both parties should know the condition of the property at the beginning of the lease and any improvements that have since been made by the tenant, thus recognizing what property is a trade fixture. That is not true in a seller-purchaser relationship, where the purchaser has no way of knowing what the seller deems a trade fixture as opposed to a true fixture.

The subject property was in the building when Chase owned the building; it was not installed by Chase when it was a tenant. An agreement for the sale of real estate may routinely exclude a tenant's trade fixtures, but to purport to exclude a building owner's "trade fixtures" is a nullity, at least as the term "trade fixtures" is traditionally understood. Of course, Chase could have specifically identified the subject property as not included in the sale, but it didn't. Although it stated that the sale did not include any of Chase's trade fixtures, Chase could not have had any "trade fixtures" in the

property. Thus, not only has Chase waived its trade fixture argument, it would fail as a matter of law.

### 3.1.3. Fixtures

As stated above, the plaintiffs contend that the subject property are fixtures and, thus, were part of the property sold by Chase to BREOF. Chase disagrees.

"Fixtures are realty. They pass by transfer of title to the land unless specifically reserved in the writing…." *Premonstratensian Fathers*, 46 Wis. 2d at 366 n.1, 175 N.W.2d at 239 (quoting *Hannon v. Kelly* 156 Wis. 509, 514, 146 N.W. 512 (1914)). But determining whether property is a fixture is often difficult. Over 90 years ago, the Wisconsin Supreme Court observed, "It is probable that no branch of the law is in greater confusion than the law of fixtures." *Thomsen v. Cullen*, 196 Wis. 581, 599, 219 N.W. 439, 446 (1928). Since then, little progress has been made in clarifying this area of the law.

In general, when determining whether property is a fixture, courts consider: "(1) Actual physical annexation to the real estate; (2) application or adaptation to the use or purpose to which the realty is devoted; and (3) an intention on the part of the person making the annexation to make a permanent accession to the freehold." *All City Commun. Co. v. State Dep't of Revenue*, 2003 WI App 77, ¶13, 263 Wis. 2d 394, 661 N.W.2d 845 (quoting *Wisconsin Dep't of Revenue v. A.O. Smith Harvestore Prods., Inc.*, 72 Wis. 2d 60, 67-68, 240 N.W.2d 357 (1976)). "Although application of this test is normally a question of fact, it becomes a question of law when only one reasonable conclusion may

be drawn from the evidence." *A. O. Smith Harvestore Prods.*, 72 Wis. 2d at 68, 240 N.W.2d at 360; *see also Tri-Tech Corp. of Am. v. Americomp Servs.*, 2002 WI 88, 254 Wis. 2d 418, 437, 646 N.W.2d 822, 832 (discussing *A.O. Smith Harvestore Prods* and noting that whether property is a fixture "usually is not" a question of law).

### 3.1.3.1.     Annexation

"Annexation" is generally a question of whether the personal property has been attached to the real property. *A. O. Smith Harvestore Prods.*, 72 Wis. 2d at 68, 240 N.W.2d at 360. "[A]s a general proposition, an object will not acquire the status of a fixture unless it is in some manner or means, albeit slight, attached or affixed, either actually or constructively, to the realty." *Premonstratensian Fathers*, 46 Wis. 2d at 367-68, 175 N.W.2d at 240. The degree of annexation is a factor in assessing whether the subject property were fixtures.

The parties agree that the vault door was attached to the building. (ECF No. 46, ¶ 93.) However, they dispute whether any of the other subject property was attached to the building.

Chase's argument in its initial brief rests largely on a mischaracterization of the parties' respective burdens at summary judgment. (ECF No. 36 at 19 ("Plaintiffs must *prove* that there is exists [sic] a triable issue of fact as to whether the Equipment was attached." (emphasis in original).) It is the movant on summary judgment that has the burden to show the absence of any genuine dispute of material fact. Fed. R. Civ. P. 56(a).

The nonmovant may defeat summary judgment by showing that a genuine dispute of material fact exists, and to do so it must offer more than mere speculation. *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 477 (7th Cir. 2015). But should both sides fail to muster evidence, the court will deny the motion, not grant summary judgment as Chase suggests.

In an attempt to show that none of the remaining subject property was attached to the building, Chase asserts that "Chad Brown, Chase's then-branch manager, testified none of the safes or vaults was attached. SOF ¶¶ 72, 74, 76, 78-79." (ECF No. 36 at 21.) In fact, "Mr. Brown testified that he saw one of the safes move during the decommissioning process. SOF ¶¶ 78, 82." (ECF No. 36 at 21.) Chase also notes that it would periodically move "safe deposit boxes, safes, and cash lockers from one branch to another to meet its needs to secure customer and bank valuables and information. SOF ¶ 94." (ECF No. 36 at 21.)

However, Brown's testimony was more equivocal than Chase suggests. Although Brown testified that he did not believe the safes or lockers were attached to the building, his belief was generally based on only speculation or a superficial observation. (*See, e.g.*, ECF No. 38-16 at 13, 67:8-13 (discussing the four large bulk cash lockers: "from perception it appears that they could be moved, if you had the equipment to slide them across the room, you would be able to do that but I never had a reason to go behind it to confirm whether or not it was actually attached to the ceramic tile wall"); 12, 65:12-18

(discussing two bulk lockers: "I do not believe this was attached to the building. From the -- this is probably the longest I ever looked at it, so it appears to be that the cabinet is sort of built around this particular vault or safe or cabinet, that it could be -- if someone wanted to go through the trouble, they could simply remove it"); 21, 109:8-19 ("I did not believe it was attached to the building. … That's only based on my visual perception. … [Y]ou can kind of see around it based on its positioning within the vault, so that -- this is one where it kind of led me to believe that these were not actually attached to the tile on the wall.").)

He did not, for example, inspect the equipment to see if it was bolted to the floor or anchored from behind. The strongest inference is with respect to the signature file safe (*see* ECF No. 38-29 at 2 (photo of the safe)), which Brown testified he observed move out "a few inches" when he and others "pulled the drawers of the safe itself." (ECF No. 38-16 at 14, 76:10-12, 17-18.) But such movement does not necessarily prove the absence of any connection; it establishes only that there was not a sufficient enough connection to prevent movement of a few inches.

As for the fact that Chase would periodically move "safe deposit boxes, safes, and cash lockers from one branch to another to meet its needs to secure customer and bank valuables and information"—a fact 500 Wisconsin does not dispute but argues is immaterial (ECF No. 46, ¶ 94)—that does not establish that the subject property was not attached to the building. At most it proves that the property was detachable.

Finally, Chase relies on the report of its expert, Deborah Skau, who, Chase argues, "personally examined all of the Banking Equipment [and] has opined that the safes, cash lockers, and safe deposit boxes are not attached to the Building …. SOF ¶ 93." (ECF No. 36 at 21.) On the pages of her report that Chase cited in support of its proposed finding of fact, Skau said the following: "Like the safe deposit box nests, the non-safe deposit box equipment, other than the four-hour vault door, is not affixed to the building" (ECF No. 38-20 at 14); the "Teller/Cash Lockers" "operate and are built in a similar manner as nests of safe deposit boxes, and the modular units are stacked on top of each other and are not affixed to the building" (ECF No. 38-20 at 14); the "Mosler Cash Vaults" "sit in the room but are not affixed to the structure" (ECF No. 38-20 at 14); the "Storage Safe with Pressure Bar" "is a large standalone safe, not affixed to the structure" (ECF No. 38-20 at 15); the "Mosler Large Cash Lockers" "is a large bank of standalone cash lockers, not affixed to the structure" (ECF No. 38-20 at 15); and the "Mosler 2 Door Vault in Transaction Room" "is a very old, under-counter vault, and rests on the floor. It is not affixed to the structure." (ECF No. 38-20 at 15.) However, at no point does Skau state the basis for these conclusions. There is no indication, for example, that she physically moved or inspected all sides of any of the subject property to confirm that it was not attached to the building.

However, in attempting to show that a dispute of material fact exists as to whether the subject property was attached to the building, 500 Wisconsin offers

similarly inconclusive evidence. It relies on the deposition testimony of one of its experts, Donald Coker (ECF No. 38-12 at 3, 65:7–11), the report of another expert, Thomas J. Costantini (ECF No. 34-1 at 7), and the testimony of one of 500 Wisconsin's members, Chad Alexander (ECF No. 38-2 at 14, 63:5-10). But, again, no one actually attempted to move the subject property or otherwise inspect it to confirm it was attached to the building.

Coker testified merely that the "cash lockers" (depicted in ECF No. 38-21) were "installed," which he explained meant, "Well, they are there. They are stacked up against the wall. So they are stacked up just like bricks. They're there." (ECF No. 38-12 at 3, 65:7–11.) The fact that objects are "stacked up against the wall" obviously offers no hint as to whether they are attached to the building. And Alexander testified that Rick Warner, a person who provided an estimate for repairing the property, told him that the 35 bulk case coin lockers (the same property Coker referred to as "cash lockers" and depicted in ECF No. 38-21) were "affixed to the property." (ECF No. 38-2 at 14, 63:5-10). This is obviously inadmissible hearsay.

As for the safe deposit boxes, Costantini opined, "Safe deposit boxes come in pre-assembled welded Nests and are installed by affixing the nests to the building structure." (ECF No. 34-1 at 7.) However, he does not articulate a basis for that opinion. Nonetheless, Chase's own expert testified that the boxes are attached to the ceiling by way of "cladding," an aesthetic thin strip of sheet metal that is connected to the top of

the nests of safe deposit boxes and the ceiling to make it appear "like a nice completed area" and to hide "the gap between the top of the nest and the ceiling." (ECF No. 49-8 at 5, 160:11-161:23.) This connection, albeit slight, satisfies the threshold element of annexation.

500 Wisconsin has not cited any evidence to support a finding that the four small cash lockers (ECF No. 46, ¶ 73), the four large bulk cash lockers (ECF No. 46, ¶ 74), the six bulk cash/coin negotiable lockers (ECF No. 46, ¶ 75), and the four-door cash/storage locker (ECF No. 46, ¶ 79) were attached to the building. And the evidence it cited with respect to the 35 cash lockers was insufficient to establish that they were attached to the building. In short, just as Chase has not presented evidence sufficient to support a conclusion as a matter of law that the property were not attached to the building, 500 Wisconsin has not presented evidence sufficient to support a conclusion as a matter of law that the non-safe deposit box property were attached.

When both sides fail to present sufficient evidence, the burden of proof at summary judgment requires a finding in favor of the non-moving party. Chase has not carried its burden to prove the subject property were unattached. Therefore, for purposes of summary judgment, the court must accept that a reasonable finder of fact could conclude that the property was attached to the building in some manner, however slight, either actually or constructively, so as to satisfy the threshold element of annexation.

### 3.1.3.2. Adaptation

"Adaptation refers to the relationship between the chattel and the use which is made of the realty to which the chattel is annexed." *Premonstratensian Fathers*, 46 Wis. 2d at 370, 175 N.W.2d at 241. "The test here is not the adaptability to the building, but the adaptability to the use to which the building is put." *Id*. However, "[t]he practical efficiency of such a criterion of a fixture may well be questioned. It would but rarely occur that an article attached to land is used otherwise than in furtherance of the purpose for which the land is used." § 610. Character of Article, 2 Tiffany Real Prop. § 610 (3d ed.).

Safe deposit boxes, vaults, and other secure storage equipment are clearly property related to the purpose to which Chase put the building. But the parties describe the building as an "office building," albeit with the plaintiffs' caveat that, "prior to present day, the Building was primarily a bank branch for Chase." (ECF No. 46, ¶ 1.) In assessing the adaptation factor, an office building that happens to hold a bank branch, and the property necessary for its operation, is very different than a building that was constructed specifically to serve as a bank and that cannot be readily put to another use. *See Premonstratensian Fathers*, 46 Wis. 2d at 373, 175 N.W.2d at 243 (holding that coolers installed in a building that was constructed as and always used as a grocery store are fixtures). Thus, it is best to assess adaptation not strictly in terms of the use to which Chase put the property but the use to which a successor may put the

property. *See* § 610. Character of Article, 2 Tiffany Real Prop. § 610 (3d ed.) (footnote 80 and accompanying text).

In this regard, the plaintiffs have given the court no basis for finding that the office building was especially adapted for use as a bank aside from, perhaps, the fact that the building already had the bank-related subject property. But this reasoning is circular and no more helpful in directing an ultimate answer than observing that the subject property was useful to the purpose to which Chase put the land.

In sum, the evidence suggests that the building is an office building, not just a bank building. Banking equipment is unnecessary to the function or use of an office building.

### 3.1.3.3.  Intention

"The factor of intention is regarded as the most important of the three factors." *A.O. Smith Harvestore Prods,* 72 Wis. 2d at 68, 240 N.W.2d at 360. "This intention is 'not the actual subjective intent of the landowner making the annexation, but an objective and presumed intention of that hypothetical ordinary reasonable person, to be ascertained in the light of the nature of the article, the degree of annexation, and the appropriateness of the article to the use to which the realty is put.'" *Id.* at 69, 240 N.W.2d at 361 (quoting Brown, *Personal Property* (2d ed. 1955), p. 726, sec. 141). "In several cases [the Wisconsin Supreme Court] has held that, when the article in question is clearly adapted to and is in fact put by the owner of the realty to the use to which he has

devoted the realty, this is conclusive evidence of an intent to make a permanent accession to the realty." *Id.*

500 Wisconsin notes that, when a party's intent is at issue, summary judgment generally is not appropriate. (ECF No. 44 at 9.) Although 500 Wisconsin cites a case where the Wisconsin Court of Appeals recounted that maxim in the context of the intent factor of the fixture analysis (ECF No. 44 at 9 (citing *Vivid, Inc. v. Fiedler*, 174 Wis. 2d 142, 154, 497 N.W.2d 153, 158 (Ct. App. 1993), in turn citing *Arnold v. Shawano County Agric. Soc'y*, 106 Wis.2d 464, 469-73, 317 N.W.2d 161, 164-65 (Ct. App. 1982)), the court in *Vivid* failed to acknowledge the difference between cases in which the issue is the subjective intent of the parties (as it was in *Arnold*) and cases in which the issue is one of objective intent (as it is with respect to fixtures). Objective intent is more readily assessed on summary judgment than subjective intent. Other than arguing that removing the subject property would cause damage to the building, 500 Wisconsin does not otherwise develop an argument regarding intent. (ECF No. 44 at 12.)

Chase's argument is also terse. It argues that the fact that it "normally owns its safes, vaults, vault doors, and cash lockers, and intended that the Banking Equipment here be easily movable, from one branch to another" supports the conclusion that there was no objective intent to have the subject property become a part of the building. (ECF No. 36 at 22.) But removing the vault door apparently required using a crane and

making a hole in the roof of the building. (ECF Nos. 36 at 8; 44 at 12.) Thus, the vault door was movable, but certainly not easily movable as Chase asserts.

500 Wisconsin disputes that Chase "normally owns its safes, vaults, vault doors, and cash lockers." (ECF No. 46, ¶ 17.) But its dispute is based on a single instance in which, in a dispute over a flooded safe deposit vault in a leased property, Chase argued that the landlord was responsible for damages and repairs. The entire context of that dispute is unclear; the court has not been provided with all portions of the deposition on which 500 Wisconsin relies. (ECF No. 46, ¶ 17 (citing Zimmer Decl. Ex. 7, Bartman Dep., at 9:10–13:1); *but see* ECF No. 49-7 at 3 (omitting page 9 of the deposition).) In any event, a single instance does not undermine the proposed fact that Chase *normally* owns its safes, vaults, vault doors, and cash lockers.

The court cannot find as a matter of law that the vault door, which the parties agree was secured to the property, was not a fixture. A reasonable finder of fact could conclude that it was. The court also concludes that a reasonable finder of fact could find that the intention was that the other subject property were fixtures that were to stay with the building. The property depicted in ECF No. 38-26 and 38-29 is built-in to other fixtures (a counter and walls). The court has not received evidence as to the practicality and feasibility of removing this property. Nor has the court received information regarding the feasibility of removing the property depicted in ECF Nos. 38-24 and 38-25. It is unclear if these photographs depict single units or if these units are severable,

and if severable, to what degree. Depending on the size of these units and the specific details of what would be required to remove this property, a reasonable finder of fact could find they were fixtures.

Least suggestive of being a fixture are the 35 safes arranged in stacks of five depicted in ECF No. 38-21. It appears that each stack of five is an individual unit, roughly the size of a five-drawer file cabinet, and all seven stacks could likely be removed without leaving behind a hint that they were ever there. They are not built-in to any fixture or structure. They appear to simply sit on the floor in a room. They appear to be the sorts of safes commonly used in government or any number of business settings where secure storage is required, and which are routinely moved as operations require. However, the record is insufficient for the court to reach this conclusion as a matter of law. Chase has not shown, for example, that the safes are not secured together or secured to the floor or walls. The degree of such attachment could lead a reasonable finder of fact to conclude that they were fixtures.

As for the safe deposit boxes, the court similarly finds that it lacks sufficient relevant facts to find as a matter of law that this property is not a fixture. Although the property is modular and able to be moved between bank branches, the ease with which this may occur is unclear. Moreover, the modifications to the property necessary to make the safe deposit boxes appear as if they were a finished and coherent part of the building—for example, the cladding discussed by Chase's expert—could lead a

reasonable finder of fact to conclude that the objective intent was to make the safe deposit boxes a permanent part of the building.

The undisputed fact that Chase once owned the subject property and that it alone used it could support the conclusion that there was no intent to make the subject property part of the real estate when it sold the building. *See Renak*, 2005 WI App 193, ¶¶ 9-11, 2005 Wisc. App. LEXIS 608 (holding that 100-year-old, six-foot long, one-ton shop engine attached to a brick foundation in a machine shop remained the personal property of the life tenant when he sold the real estate). Similarly, the fact that Chase paid personal property taxes on the subject property would seem to belie any conclusion that the objective intent was that the property were fixtures. (*See* ECF No. 46, ¶ 38.) But these facts are insufficient to support the conclusion that the subject property was, as a matter of law, not a part of the real estate.

For the court to grant Chase's motion, the undisputed facts would have to show that, as a matter of law, the subject property were not fixtures and therefore were not included in the sale from Chase to BFEOF. Chase failed in its burden to present undisputed facts to support this conclusion.

### 3.1.4. 500 Wisconsin's Alleged Knowledge of Chase's Ownership

Chase next argues that 500 Wisconsin knew or should have known that Chase owned the subject property because it is undisputed that Chase alone used the subject property in its business. (ECF No. 36 at 22-24.) But the fact that Chase alone used the

property does not establish ownership. Tenants routinely have exclusive use of fixtures of a property during a tenancy, but that does not evidence ownership. The case on which Chase relies, *Ubbink v. Herbert A. Nieman & Co.*, 265 Wis. 442, 62 N.W.2d 8 (1953), involved a successor landlord's obligation to inquire as to a tenant's trade fixtures. As explained above, the trade fixture doctrine is inapplicable under the facts of this case.

### 3.1.5. The Parties' Conduct

Chase next argues that "[t]he parties' conduct also confirms that 500 Wisconsin LLC knew and understood (or should have) that Chase owned the" subject property. (ECF No. 36 at 24.) It notes that 500 Wisconsin "never cleaned, fixed, paid taxes on, or otherwise sought access to the" subject property. (ECF No. 36 at 24.) Chase alone possessed keys and combinations to all the subject property. (ECF No. 36 at 24.)

All of these facts are relevant to whether there was the objective intent to make the subject property part of the real estate. But they are insufficient for the court to find as a matter of law that 500 Wisconsin did not own the subject property.

### 3.1.6. Equitable Estoppel

Chase argues that 500 Wisconsin should be equitably estopped from asserting its damage claims because 500 Wisconsin knew of Chase's drilling but made no effort to stop it. (ECF No. 36 at 24-25.)

The fact that 500 Wisconsin did not stop Chase from forcibly entering the secure property it was unable to access does not preclude 500 Wisconsin from now asserting a

claim for damage. As Chase argues, it was required to gain access to all secure locations to ensure that no bank or customer property was left behind. In other words, even if 500 Wisconsin had objected, Chase was required to proceed anyway. Moreover, 500 Wisconsin could have reasonably assumed that any unlawful damage Chase caused would have been repaired.

### 3.2. Challenges to 500 Wisconsin's Individual Claims

Although disputes of material fact preclude summary judgment with respect to Chase's broad challenges to 500 Wisconsin's complaint, Chase also offers specific challenges to 500 Wisconsin's individual claims.

### 3.2.1. Breach of Contract

In Count 1 of the complaint 500 Wisconsin alleges that Chase breached the lease by, among other things, "altering, modifying, and changing the Building without 500 Wisconsin's prior written consent, causing significant damage to the Building." (ECF No. 1-1, ¶ 17.)

The lease stated:

> Tenant shall be permitted to make non-structural alterations, modifications and other changes (Improvements) to the Demised Premises provided Tenant gives reasonable prior notice thereof to Landlord; provided, however, that no notice shall be required for purely decorative Improvements, such as painting, carpeting and window treatments. Tenant shall not make any Improvements which could materially affect any of the Building's systems or any structural elements of the Building or the exterior of the Building or any other tenant space or the common areas of the Real Property without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed.

(ECF No. 38-1 at 20, sec. 12.01(a).) 500 Wisconsin's breach of contract claim relies on the final sentence, which it argues required its written consent for Chase to drill open the subject property.

But written consent was required only if the improvement "could materially affect any of the Building's systems or any structural elements of the Building or the exterior of the Building or any other tenant space or the common areas of the Real Property." 500 Wisconsin does not argue that drilling open the subject property could materially affect any building system (which the lease discusses in the context of heating, ventilation, and air conditioning equipment (*see* ECF No. 38-1 at 13, sec. 5.01(c))) or structural element. Nor did drilling stand to affect the exterior or common areas of the building. The only basis for 500 Wisconsin's argument that Chase breached this provision of the lease is its contention that the drilling affected "other tenant space." (ECF No. 44 at 17.) It argues, "The Fixtures were included within Chase's leased space, and therefore were included within the meaning of 'any other tenant space.'" (ECF No. 44 at 17.)

500 Wisconsin's argument rests on a misunderstanding of "any other tenant space." Chase was defined in the lease as "Tenant," with a capital T. (ECF No. 38-1 at 5.) But section 12.01(a) of the lease, the provision quoted above and upon which 500 Wisconsin's breach of contract claim relies, refers to "other tenant space." Rather than using the defined term "Tenant," which refers to Chase, the provision used the generic

"tenant." Thus, "other tenant space" refers to the space of a building tenant other than Chase. This reading is consistent with other provisions of the lease, which repeatedly refer to the parties' obligations with respect to "other tenant[s]" of the building. (*See, e.g.*, ECF No. 38-1 at 8, sec. 3.01(e)(xv) and (xx) (defining "Operating Expenses" to include certain expenses related to other tenants); 15, sec. 5.08 (discussing other tenants' right to access the elevator); 23, sec. 14.02 (discussing liability for damage caused by other tenants); and 33, sec. 23.02 (discussing "[a]ny failure by Landlord to enforce any Rules and Regulations, either against Tenant or any other tenant in the Building …")

Section 12.01(a) expressly authorized Chase to perform decorative improvements, such as painting or carpeting, without having to give notice to the landlord. And it authorized various other improvements as long as Chase provided notice to the landlord. But under 500 Wisconsin's reading of the lease, Chase would be required to obtain the landlord's written consent for *any* alteration of the space Chase rented. This reading plainly contradicts the preceding two sentences of Section 12.01(a) expressly authorizing Chase to make improvements to its space with, at most, notice to the landlord.

Therefore, even if the subject property were fixtures, the lease did not require Chase to obtain 500 Wisconsin's written consent before drilling open the subject property. That being the only asserted basis for 500 Wisconsin's breach of contract claim, Chase is entitled to summary judgment on Count 1 of the complaint.

### 3.2.2. Claim Under Wis. Stat. §§ 895.446 and 943.01

Count 2 of the complaint alleges a damage to property claim under sections 895.446 and 943.01 of the Wisconsin Statutes. (ECF No. 1-1 at 5-6.) Wisconsin Statute § 895.446 provides a civil remedy for victims of certain property crimes. 500 Wisconsin alleges that, in drilling open the subject property, Chase violated Wis. Stat. § 943.01, which makes it a crime for a person to intentionally cause damage to any physical property of another without the person's consent. Wis. Stat. § 943.01(1).

500 Wisconsin argues that "Chase caused excessive damage to the Fixtures, above and beyond a normal and professional drilling." (ECF No. 44 at 18.) It does *not* argue that drilling the subject property was criminal; it acknowledges that Chase needed to get into the various vaults, drawers and safe deposit boxes to ensure that no bank or customer property was left behind. Instead, it contends that Chase excessively damaged the subject property to prevent a competing bank from renting the space and using the equipment. (ECF No. 44 at 19.)

Chase argues that 500 Wisconsin cannot prove criminal intent because it is undisputed that Chase believed the subject property belonged to it, as evidenced by contemporaneous communications and the fact that Chase paid taxes on the property the entire time it was a tenant. (ECF Nos. 36 at 31; 54 at 16.) Chase further argues that there is no evidence of intentional damage. (ECF No. 54 at 17.) While Chase intentionally drilled open the subject property, it is undisputed that this was an

appropriate way to ensure that no bank or customer property was left behind. It argues that 500 Wisconsin has not presented evidence that Chase's actions were for any purpose other than ensuring that the subject property was empty. Finally, it argues 500 Wisconsin cannot prove that the allegedly excessive damage occurred after 500 Wisconsin acquired the property. After all, drilling safe deposit boxes and other secure property was a routine practice for Chase. (ECF No. 46, ¶¶ 46, 47.)

Section 943.01(1) states, "Whoever intentionally causes damage to any physical property of another without the person's consent is guilty of a Class A misdemeanor." "'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Wis. Stat. § 939.23(3). "In addition, … the actor must have knowledge of those facts which are necessary to make his or her conduct criminal and which are set forth after the word 'intentionally'." Wis. Stat. § 939.23(3). Thus, for Chase to be liable it must not only have intentionally caused the damage but must have known that it was causing damage to the "physical property of another" and known that that person did not consent. *Cf. Shetty v. Pulla*, 2017 WI App 14, 373 Wis. 2d 766, 895 N.W.2d 854, 2017 WI App 14 (unpublished).

500 Wisconsin has not adduced evidence from which a reasonable finder of fact could conclude that Chase knew that 500 Wisconsin owned the subject property. Rather, all the evidence supports the conclusion that Chase subjectively believed it owned the

subject property at the time of the drilling. It is undisputed that Chase paid property taxes on the subject property. Moreover, it is undisputed that Chase had previously owned the subject property, and in its other branches, aside from perhaps one instance related to a flood in a leased branch, it always claimed to own such property. The parties' contemporaneous conduct is consistent with Chase's ownership. For example, Chase alone maintained access to and serviced the subject property. Moreover, 500 Wisconsin was aware of the drilling but never expressed any reservation or right in the property.

500 Wisconsin has failed to present evidence that Chase knew it was drilling property owned by 500 Wisconsin. As a result, Chase is entitled to summary judgment on the second count of the complaint.

### 3.2.3. Conversion

In Count 3 of the complaint 500 Wisconsin alleges that Chase intentionally destroyed property belonging to 500 Wisconsin. (ECF No. 1-1 at 6.) Chase argues that 500 Wisconsin's conversion claim depends on the subject property being a fixture. If the subject property was converted by Chase, it had to have been owned by 500 Wisconsin. 500 Wisconsin argues it owned the subject property because they were fixtures. But if the subject property were fixtures, they were real property. If real property, Chase contends, 500 Wisconsin's conversion claim fails because a conversion claim cannot apply to real property.

500 Wisconsin responds that, aside from chattel, money may be converted. (ECF No. 44 at 21 (quoting *Methodist Manor of Waukesha, Inc. v. Martin*, 2002 WI App 130, ¶ 7, 255 Wis. 2d 707, 647 N.W.2d 409).) And 500 Wisconsin's counsel notes that he "recently obtained a jury verdict, including punitive damages, for a conversion claim based on the destruction of trees and a fence attached to real property. *Hookstead v. Beal*, Dodge County Case No. 18-CV-242." (ECF No. 44 at 21.)

That money, in addition to chattel, may be subject to a conversion claim does not address whether real property can be subject to a claim of conversion. And 500 Wisconsin's counsel's experience in another action is non-precedential and irrelevant; nothing suggests that the court in that case addressed the question of whether a conversion claim properly applies to real property. In any event, when trees are severed from the soil they cease to be real property and become personal property. *Hicks v. Smith*, 77 Wis. 146, 149, 46 N.W. 133, 134 (1890)

The Wisconsin Court of Appeals has observed that "it is … unclear, at best, whether conversion is a viable claim when the property alleged to be converted is real property and not personal property." *Fischer v. Estate of Fischer*, 2013 WI App 105, ¶ 17, 349 Wis. 2d 788, 837 N.W.2d 177, 2013 Wisc. App. LEXIS 614 (unpublished) (citing *Deutsche Bank Nat'l Tr. Co. v. Pauk*, 2012 WI App 73, ¶ 62, 342 Wis. 2d 248, 816 N.W.2d 350, 2012 Wisc. App. LEXIS 450). In *Deutsche Bank*, the court of appeals noted that a conversion action is traditionally limited to personal property. *Deutsche Bank*, 2012 WI

App 73 n.7 (citing *Production Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 82 Wis. 2d 5, 10, 261 N.W.2d 127 (1978) ("plaintiff in a conversion suit … must allege and prove either that it was in possession of *the chattel* at the time of the conversion or that it was entitled to immediate possession") (emphasis added); *id.* at 10 n.8 ("court has defined conversion as 'any distinct act of dominion wrongfully exerted over another's *personal property* in denial of or inconsistent with his rights therein, such as a tortious taking of another's *chattels*, or any wrongful exercise or assumption of authority ... over another's *goods*'") (emphasis added). The court went on to note that the leading treatises on torts note that the tort was traditionally limited to personal property. *Deutsche Bank*, 2012 WI App 73 n.7 (citing Dan B. Dobbs, et al., The Law of Torts § 63 (2d ed. 2011) (the tort of conversion was traditionally limited to personal property and its modern expansion is largely limited to certain intangible property); W. Page Keeton, et al., Prosser and Keeton on Torts, Lawyer's Edition § 15 (5th ed. 1984) (same)). Even the Wisconsin statute setting the statute of limitations with respect to an action for conversion suggests that the tort is limited to personal property. *Deutsche Bank*, 2012 WI App 73 n.7 (citing Wis. Stat. § 893.51(1) (an "action to recover damages for the wrongful taking, conversion or detention of *personal property* shall be commenced within 6 years after the cause of action accrues or be barred) (emphasis added)). In fact, the title of Wis. Stat. § 893.51 is, "Action for wrongful taking of personal property."

The parties agree that Wisconsin law applies to this diversity action. Thus, it is this court's obligation to apply the law as it believes the Wisconsin Supreme Court would. *Doermer v. Callen*, 847 F.3d 522, 527 (7th Cir. 2017). Because it does not appear that the Wisconsin Supreme Court has ever explicitly decided whether a claim for conversion may apply to real property, this court considers the decisions of other Wisconsin courts as persuasive authority as to how the Wisconsin Supreme Court would decide the issue. *See Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 741 (7th Cir. 2016).

The court finds the court of appeals' analysis in *Deutsche Bank* is persuasive as to how the Wisconsin Supreme Court would decide the question presently before this court. However, the authority is not "unclear, at best," as the court of appeals describes it. *Deutsche Bank Nat'l Tr. Co. v. Pauk*, 2012 WI App 73, ¶ 62. Rather, the authority supports only one conclusion: that the tort of conversion does not apply to real property. This understanding is consistent not only with Wisconsin law but also with the authoritative treatise on the law of torts, *see* § 63. Property Subject to Conversion, Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts § 63 (2d ed.), and the Restatement (Second) of Torts, *see* Restatement 2d of Torts, § 226 (discussing the tort of "conversion by destruction or alteration" as applying only to chattel).

The complaint depends on the subject property being a fixture. The plaintiffs do not argue that 500 Wisconsin acquired the subject property through any means other

than by purchasing the building. But if the subject property were fixtures, then they were part of the real property and not personal property. *Premonstratensian Fathers*, 46 Wis. 2d at 366 n.1, 175 N.W.2d at 239. As real property, they cannot be subject to a claim for conversion.

Consequently, Chase is entitled to summary judgment with respect to Count 3 of the complaint.

### 3.2.4. Negligence

Count 4 of the complaint alleges that Chase breached a duty of care that it owed to 500 Wisconsin when it drilled open the subject property. (ECF No. 1-1 at 6-7.) Chase argues that 500 Wisconsin's negligence claim fails because the lease defines the parties' obligations with respect to repairs, foreclosing 500 Wisconsin from resorting to tort damages. (ECF Nos. 36 at 31-32; 54 at 20.)

Section 21.01 of the lease provided:

Without limiting the provision of Article 12, upon the expiration or sooner termination of this Lease or upon re-entry by Landlord upon the Demised Premises, Tenant, at Tenant's expense, shall quit and surrender the Demised Premises in its then condition and repair, in broom-clean condition, without any obligation to repair, restore or perform any other work to the Demised Premises, the Building or the Real Property to remove any improvements or other changes of any kind or nature, whether or not made by or on behalf of Tenant and whether or not made before or after the Commencement Date, or to remove any of its property and/or trade or other fixtures. Tenant, in its sole election, however, may remove all or part of its property and/or trade and other fixtures at its own cost and expense.

(ECF No. 38-1 at 31, sec. 21.01.) 500 Wisconsin argues that

Section 21.01 of the lease is "subject to" Section 12.01(a) of the lease, which Chase breached when it failed to provide notice of the alterations it made to the Building. RSOF ¶¶ 21, 49. As a result of Section 21.01 being "without limiting" Section 12.01, while Chase can leave the Property in its then existing condition, Chase cannot first alter the Property without 500 Wisconsin LLC's permission. However, that is precisely what Chase did here. Chase damaged 500 Wisconsin LLC's property without its permission in violation of the lease. Chase cannot then leave the damage and cite Section 21.01 of the lease as an excuse.

(ECF No. 44 at 24-25.)

As discussed above, Section 12.01(a) did not require Chase to obtain 500 Wisconsin's written consent before drilling open the subject property. The lease is explicit that Chase was "without any obligation to repair, restore or perform any other work to the Demised Premises" when it terminated its lease. 500 Wisconsin cannot use tort law to impose on Chase an obligation that the contract between Chase and 500 Wisconsin explicitly barred. *See Van Lare v. Vogt, Inc.*, 2004 WI 110, ¶18, 274 Wis. 2d 631, 683 N.W.2d 46. This being 500 Wisconsin's only argument as to why Section 21.01 does not bar its negligence claim, the court finds that Chase is entitled to summary judgment as to Count 4 of the complaint.

### 3.2.5.  Seneca's Subrogation Claim

Having concluded that Chase is entitled to summary judgment on all of 500 Wisconsin's claims, Seneca's subrogation claim (Count 5 of the complaint) also fails. Thus, Chase is entitled to summary judgment on Count 5 of the complaint as well.

**4. Chase's Motions to Exclude 500 Wisconsin's Experts**

Chase moves to bar Donald Coker (ECF No. 29), Bryan Henne, Marc McGranahan, and Peter Moegenburg (ECF No. 32) from testifying as experts for the plaintiffs. Having concluded that Chase is entitled to summary judgment on all of the plaintiffs' claims, these motions are moot and dismissed as such.

**5. Conclusion**

Even if the subject property were fixtures, and thus belonged to 500 Wisconsin, all of the claims asserted by the plaintiffs in the complaint fail as a matter of law. Section 12.01(a) of the lease, on which 500 Wisconsin relies for its breach of contract claim, did not require Chase to obtain 500 Wisconsin's written consent before drilling open the subject property. 500 Wisconsin's property damages claim under Wis. Stat. §§ 895.446 and 943.01 fails because 500 Wisconsin has not adduced evidence that could support a finding that Chase knew the subject property belonged to 500 Wisconsin. 500 Wisconsin's conversion claim fails as a matter of law because 500 Wisconsin owned the subject property only if it was fixtures, i.e., real property, and a conversion claim cannot be made as to real property. 500 Wisconsin's common law negligence claim fails because the parties' lease expressly relieved Chase of any obligation to repair the subject property. And because all of Chase's claims fail, Seneca's subrogation claim fails as well.

**IT IS THEREFORE ORDERED** that Chase's motion for summary judgment (ECF No. 35) is **granted**. The plaintiffs' complaint and this action are dismissed. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Chase's motions to exclude the plaintiffs' experts (ECF Nos. 29, 32) are **moot and dismissed as such**.

Dated at Milwaukee, Wisconsin this 31st day of July, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge